PAPIN (ST. LOUIS NAT. BANK v.). See Case No. 12,239.

PAQUET BOT DE CAYENNE, The (HALL v.). See Case No. 5,941.

———

## Case No. 10,708.

### The PARAGON.

[1 Ware (322) 326.] [1]

District Court, D. Maine. April 28, 1836.

SHIPPING — CARRIAGE OF GOODS — LIABILITY FOR LOSS—SACRIFICE FOR COMMON SAFETY—GENERAL AVERAGE—PRIORITY OF CLAIMS.

1. Every contract of the master within the scope of his authority as master, by the general maritime law, binds the vessel, and gives the creditor a lien upon it for his security.

[Cited in The Flash, Case No. 4,857; The Panama, Id. 10,703; Stone v. The Relampago, Id. 13,486; The Williams, Id. 17,710; The Edwin v. Naumkeag Steam Cotton Co., Id. 4,301; The Lulu, 10 Wall. (77 U. S.) 201; The Kalorama, Id. 212; Roberts v. The Windermere, 2 Fed. 727; The Canada, 7 Fed. 120; The T. A. Goddard, 12 Fed. 178; The Brantford City, etc., 29 Fed. 385. Approved in Florez v. The Scotia, 35 Fed. 917. Cited in The Wilmington, 48 Fed. 568; The Roanoke, 50 Fed. 577.]

2. The master is responsible for the safe stowage of merchandise under deck. If he carries goods on deck, without the consent of the owner, he is responsible for their safety, and if they are lost by the dangers of the seas, it will be his loss.

[Cited in Weston v. Minot, Case No. 17,453; Chubb v. Seven Thousand Eight Hundred Bushels of Oats, Id. 2,709; The Watchful,

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. Ashur Ware, District Judge.]

Id. 17,250; The Thomas P. Thorn, Id. 13,-927; The Delaware, 14 Wall. (81 U. S.) 604; The Governor Carey, Case No. 5.645a; The Gran Canaria, etc., 16 Fed. 873.]

3. If goods carried on deck are sacrificed for the common safety, goods under deck do not contribute to the loss.

[Cited in The Delaware. 14 Wall. (81 U. S.) 604; Wood v. The Sallie C. Morton, Case No. 17,962.]

4. There is no established custom of trade between Portland and Boston. authorizing the master to carry goods on deck without the consent of the owner.

5. To establish a local custom. derogating from the general law, it is not enough to prove that the act has been frequently done. It must be shown to be so generally known and recognized, that a fair presumption arises that the parties, in entering into their engagement. do it with a silent reference to the custom, and tacitly agree that their rights and responsibilities shall be determined by it.

[Cited in The Hendrik Hudson, Case No. 6,-358; Chubb v. Seven Thousand Eight Hundred Bushels of Oats, Id. 2.709; Clifton v. A Quantity of Cotton, Id. 2,895.]

6. Where there are several privileged debts against a vessel, those which are in the same rank of privilege are to be paid concurrently. But debts occupying a higher rank of privilege are fully paid before any allowance is made to those holding a lower rank of privilege.

[Cited in Dudley v. The Superior. Case No. 4,115; The St. Joseph. Id. 12.229; The Illinois, Id. 7,005; The E. A. Barnard, 2 Fed. 719; The Frank G. Fowler, etc., 8 Fed. 333; The Arcturus. 18 Fed. 744; The J. W. Tucker. 20 Fed. 131; The Lady Boone, 21 Fed. 732.]

7. Seamen's wages for the last voyage are preferred in a decree against the vessel. to all other claims, after the expenses of justice necessary to procure a condemnation, and such charges as accrue, after the vessel is brought into port, as wharfage, &c.

[Cited in Porter v. The Sea Witch, Case No. 11,289; The Lillie Laurie. 50 Fed. 221.]

Three libels were filed against this vessel; one by Charles Moody, founded on a bill of lading of merchandise, shipped to his order at Boston for this port, and consigned to him, and which was not delivered; another by Mitchell & Cobb, for goods shipped for them by their order, by a parol agreement without a bill of lading; and a third by Tarr, one of the crew, for wages. It appeared from the evidence that the Paragon [Elwell, master] sailed from Boston the last of February, and meeting with tempestuous weather, it became necessary to throw overboard the goods of the libellants, which were stowed on deck, for the safety of the ship and the lives of the crew, by which means the shippers lost their goods. That part of the cargo which was stowed under deck arrived safe. The bill of lading in Moody's case was produced, and the shipping of the goods for Mitchell & Cobb was proved by parol evidence. The libel for wages was not contested. The vessel was let to the master, on shares, he to victual, man, and have the control of the vessel, and pay two fifths of her earnings for the hire of the vessel.

W. P. Fessenden, for libellants.
Fessenden & Deblois, for claimants.

WARE, District Judge. The liability of the vessel to answer for the non-execution of a contract of affreightment entered into by the master, is not controverted; and it makes no difference, in this respect, whatever be the form of the contract, whether it be by charter-party or by bill of lading, or whether the contract be in writing or by parol. By the general maritime law, every contract of the master, within the scope of his authority as master, binds the vessel, and gives the creditor a lien upon it for his security. But it is contended that the goods, in this case, having been lost by the dangers of the seas, both the master and the vessel are exempted from responsibility within the common exemption in bills of lading; and the goods having been thrown overboard from necessity, and for the safety of the vessel and cargo, as well as the lives of the crew, that it presents a case for a general average or contribution, upon the common principle that when a sacrifice is made for the benefit of all, that the loss shall be shared by all. In Moody's case, the contract is by bill of lading, and the danger of the seas is expressly excepted by the terms of the contract. The contract in Mitchell & Cobb's case, being by parol, is silent on this subject. But in every contract of affreightment, losses by the dangers of the seas are excepted from the risks which the master takes upon himself, whether the exception is expressed in the contract or not. The exception is made by the law, and falls within the general principle that no one is responsible for fortuitous events and accidents of major force. Casus fortuitos nemo præstat. But then the general law is subject to an exception. that when the inevitable accident is preceded by a fault of the debtor or person bound, without which it would not have happened, then he becomes responsible for it. Pothier, des Obligations. No. 542; Pret. a Usage, No. 57; Story, Bailm. c. 4, No. 241; In Majoribus casibus si culpa ejus intervenit tenetur; Dig. 44, 7, 1, § 4.

It was abundantly proved in this case, nor has it been questioned at the argument, that the jettison was, by the violence of the tempest, rendered necessary for the common safety. But then it is answered that it was rendered necessary only in consequence of the goods being laden on deck, and that if they had been properly secured under deck they would have been saved, as all the goods which were thus secured were delivered uninjured. It is evident, therefore, that the loss was occasioned solely by their being placed in this exposed and hazardous situation. And this presents the principal question which has been argued in the present case, whether the master was authorized to stow the goods in this manner. If he was, without any special agreement with the

shippers for that purpose, then no fault is imputable to him, and the consequence contended for by the counsel for the respondents seems naturally to follow, that the loss having been clearly a sacrifice for the common safety, is a proper case for contribution. 4 Boulay-Paty, Cours de Droit Maritime, p. 566; 2 Boulay-Paty, Cours de Droit Maritime, p. 31; Phil. Ins. 332. The master is responsible for the safe and proper stowage of the cargo, and there is no doubt that by the general maritime law he is bound to secure the cargo safely under deck. The only exception to the universality of this rule which our books on maritime law furnish, if that can be considered an exception, is in the Commercial Code of France. That, after stating the general principle that the master is responsible for goods laden on deck, excepts from the rule petit cabotage. Article 219. But this can hardly be considered an exception, because it is confined to a trade that is carried on principally in undecked boats. 1 Valin, Comm. 397; 2 Valin, Comm. 203; Rogron sur Code de Commerce, art. 219. If the master carries goods on deck without the consent of the shipper, unless he can bring himself within some such exception, he does it at his own risk. If they are damaged or lost in consequence of their being thus exposed, he cannot protect himself from responsibility by showing that they were damaged or lost by the dangers of the seas. If, from stress of weather, it becomes necessary to throw them overboard for the common safety, this will not be a loss to be divided with the rest of the cargo, by a general average, but will be the particular loss of the master and the ship-owners, who are responsible for his acts; because it was in consequence of the fault of the master, in overloading the vessel, that the jettison was rendered necessary. When the shipper consents to his goods being carried on deck, he takes the risk upon himself of these peculiar perils, and if it becomes necessary to sacrifice the goods for the safety of the ship and the rest of the cargo, he cannot call on the other shippers for a contribution. They enter into no partnership with him in this peculiar and extraordinary risk, but he takes the whole upon himself, though his own goods are liable to contribution if they are saved by a sacrifice of any of the cargo under deck. This is the doctrine of all the authorities, ancient and modern. The reason of the law is obvious. Goods thus situated are too much exposed themselves; and not only this, but by encumbering the deck they embarrass the crew, render the manœuvering of the vessel difficult, and in tempestuous weather endanger the safety of the vessel and the rest of the cargo. Consulat de la Mer, c. 186; Peckius, Ad rem Nauticam, Vinnius, p. 236, note; Emerigon, des Assurances, c. 12, § 42; Dodge v. Bartol, 5 Greenl. 286; 1 Phil. Ins. 332, 364; Stev. Av. (Phil. Ed.) pp. 64–210.

It is contended that in this case there was a special agreement that the goods should be carried on deck. But it is to be observed, in the first place, that neither of the libellants were in Boston at the time of the shipment, so that no consent could be given by them personally. The goods were shipped by their correspondents, to their order, and the merchants who shipped them expressly deny that they gave any consent to their being carried on deck. The mate, and Edwards, one of the crew, did, indeed, testify that something was said about some of the goods going on deck. But their testimony was not very explicit, and by no means sufficient to overcome the direct testimony on the other side. Besides, the master gave, in Moody's case, what is called a clean bill of lading, that is, one in the common form, without any memorandum in the margin, stating that the goods were on deck. Now the witnesses who have testified to the usage generally, say that a clean bill of lading implies that the goods are under deck. But independent of any proof, such would be the legal effect of the contract. The bill of lading being in the usual form, it binds the master to secure and carry the goods in the usual way, that is, under deck, unless he can prove the custom set up, exempting him from this obligation. The same remark, substantially, may be applied to the case of Mitchell & Cobb. The verbal contract of affreightment will be presumed to be a contract to stow and carry the goods in the usual way, unless a different agreement is proved. But upon this point the proof fails.

In the second place, it is contended that this case is withdrawn from the general rule by the usage of this particular trade, it being, as it is said, an established custom in the trade between this port and Boston, for vessels to carry a part of their cargo on deck; and it is proved that vessels built specially for this trade are constructed with an express view to their carrying a deck-load. This is, indeed, the principal question in the case, and it is one of grave importance, as affecting the trade of this port, and deserves a very mature consideration. It is not denied that such a custom may exist in a particular trade, as will authorize the master to carry a part of his cargo on deck, without subjecting himself to responsibility for its loss, or any damage it may sustain from the dangers of the seas, in being thus exposed. Story, Bailm. p. 339. The French Ordinance de la Marine, liv. 2, tit. 1, art. 12, in conformity with the general maritime law, prohibits the master from lading goods on deck, under the penalty of answering personally for any damage that may happen to them on that account. But notwithstanding the positive text of the law, a custom has always prevailed in some of the ports of the kingdom, of lading goods on deck in small vessels employed in petit cabotage. This custom was sanctioned by the courts, and

the master relieved from his responsibility under the general law. 1 Valin, Comm. 397; 2 Valin, Comm. 203. The exception, which was introduced by usage and confirmed by the jurisprudence of the courts, has been incorporated into the text of the Code de Commerce, No. 219.

In our law, the rule requiring the cargo to be safely stowed under deck does not stand upon the express text of any act of the legislature, but upon the authority of general usage and custom. A rule of law that is established by custom may be repealed or restrained by a contrary custom. But the general rule being founded on the common custom of the country, universally known, and having the force of a general law, he who would exempt himself from its obligation by a special local custom, is bound to prove the local custom by clear and conclusive evidence. Because the legal presumption is that every contract is entered into with the understanding and intention of the parties that their rights under it are to be governed and determined by the general law. A local custom, in order to be binding on the parties, and withdraw their contracts from the application of the common law, must be so generally known and understood that it may fairly be presumed that all persons engaging in that particular trade are acquainted with it and assenting to it, as they are presumed to know the general law. The presumption then will be that they form their engagements with a silent reference to the special custom. And the custom, to be obligatory, must not be a loose practice, but precise, definite, and certain, so as to supply the place of the common law in the given case, and be capable of being applied to the contract and defining and fixing the rights of the parties under it. Such a custom, when it is established, and so generally known and recognized that parties are presumed in their engagements tacitly to refer to it, applies itself to the contract, and forms, as it were, the complement to the terms in which the obligation is expressed by the parties, and within its proper sphere, is equally binding with the general law. The doctrine that, in conventionibus tacite veniunt ea quæ sunt moris et consuetudinis, is peculiarly applicable to commercial law.

Let us then look at the evidence, and see if any such custom is proved. A large number of witnesses were examined to this point, both by the libellants and respondents. It was very fully proved that it was customary, in point of fact, for vessels trading between this port and Boston to carry a deck-load, and that usually, though not universally, the same freight is charged for goods on deck as under deck. The packets, which are built for this particular trade, are made strong in their upper works, for the express purpose of carrying a deck-load, and it appeared to be the opinion of packet-masters that goods, not liable to be injured by being wet, were about

as safe in these vessels above as under deck. But vessels built for the fishing business, as was the case with the Paragon, are not considered to be safe in tempestuous weather with a heavy deck-load. The general practice, though it is not always done, is to specify in the margin or in the body of the bill of lading, those goods which are placed on deck. If the shipper does not object when he sees the bill of lading, he is considered as assenting to his goods going in that way, and the understanding is then that the master is exempted from any special responsibility. Whether the master has a right to carry goods on deck, when nothing is said by the shipper as to the manner in which they shall be carried, is a point on which there is some variation in the testimony. Some of the ship-masters think, that, under the custom, it is left to the discretion of the master how the goods shall be stowed, and if they are goods of that description which it is customary to carry on deck, that he does not incur any extra responsibility by carrying them in that manner.

Such is the substance of the testimony. It would be dangerous to the best interests of commerce, to hold that a special custom, derogating in an important particular from general principles, could be established, and the uniformity and certainty of the law be destroyed by evidence so loose and indefinite as this. The practice of carrying a deck-load is, indeed, abundantly proved. And it may also be admitted to be proved that if the shipper consents to his goods being carried on deck, the master will not be liable for any loss or damage that is occasioned by the dangers of the seas. But this is no more than follows from the general principles of law, independent of any special custom. Modus et conventio vincunt regulam. In any case, if the owner consents to his goods being carried on deck, the master will be exempted from his responsibility. But when we come to the principal question, that which constitutes the essence of the custom, if there be one departing from the general rule, that is, whether the master is authorized to carry goods on deck when the parties in entering into the contract are silent on that subject, then we find that the witnesses disagree. The preponderance of the testimony is against the custom. But in order to prove such a custom as is allowed to have the force of law, it is not enough to show that the act, which it is pretended that the custom authorizes, is sometimes, or is often done; you must go further, and show that the right to do it is so generally recognized that a fair presumption arises that the parties, in forming their engagements, silently assent to it, and tacitly agree that their rights shall be determined by the custom. No such general understanding is proved in this case. The evidence, therefore, entirely fails in establishing the custom set up by the respondents. The con-

sequence is, that the rights and obligations of the parties must be determined by the general law. That clearly is, that if the master carries goods on deck, without the consent of the shipper, he is personally responsible, and through him the ship, for any loss or damage the goods may sustain from being thus exposed; and if it becomes necessary, from stress of weather or the dangers of the seas, to sacrifice the deck-load for the common safety, this does not present a case for contribution or general average, but it is the particular loss of the master, it having been occasioned by his own fault. The vessel being bound for the acts of the master, the decree must be that she is liable to the shippers for the loss of their goods.

It is suggested that the vessel will be insufficient to pay all the claims against it. That being the case, it will be necessary to marshal the debts according to the order of preference in which they are privileged. When all the debts hold the same rank of privilege, if the property is not sufficient to fully pay all, the rule is that the creditors shall be paid concurrently, each in proportion to the amount of his demand. But when the debts stand in different ranks of privilege, then the creditors who occupy the first rank shall be fully paid before any allowance is made to those who occupy an inferior grade. Among privileged debts against a vessel, after the expenses of justice necessary to procure a condemnation and sale, and such charges as accrue for the preservation of the vessel after she is brought into port (1 Valin, Comm. 362; Code de Commerce, No. 191), the wages of the crew hold the first rank, and are to be first paid. And so sacred is this privilege held, that the old ordinances say that the savings of the wreck are, to the last nail, pledged for their payment. Consulat de la Mer, c. 138; Cleirac sur Jugemens d'Oleron, art. 8, note 31. And this preference is allowed the seamen for their wages, independently of the commercial policy of rewarding their exertions in saving the ship, and thus giving them an interest in its preservation. The priority of their privilege stands upon a general principle affecting all privileged debts, that is, among these creditors he shall be preferred who has contributed most immediately to the preservation of the thing. 2 Valin, Comm. 12, liv. 3, tit. 5, art. 10. It is upon this principle that the last bottomry bond is preferred to those of older date, and that repairs and supplies furnished a vessel in her last voyage take precedence of those furnished in a prior voyage, and that the wages of the crew are preferred to all other claims, because it is by their labors that the common pledge of all these debts has been preserved and brought to a place of safety. To all the creditors they may say, Salvam fecimus totius pignoris causam. The French law (Ordinance de la Marine, liv. 1, tit. 14, art. 16; Code de Commerce, 191) confines the pri-

ority of the seamen for their wages to those due for the last voyage, in conformity with the general rule applicable to privileged debts, that is, that the last services which contribute to the preservation of the thing, shall be first paid. But this restriction is inapplicable to the engagements of seamen in short coasting voyages, which are not entered into for any determinate voyage, but are either indefinite as to the terms of the engagement and are determined by the pleasure of the parties, or are for some limited period of time.